UNITED STATES COURT OF APPEALS

FIFTH CIRCUIT

No. 94-20733
Summary Calendar

SANDRA G. WATERS,

Plaintiff-Appellant,

versus

SHIRLEY S. CHATER, Commissioner
of Social Security,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
(CA H 93 0271)

(August 18, 1995)

Before SMITH, DeMOSS, and PARKER, Circuit Judges.

PER CURIAM:[*]

The plaintiff appeals the judgment of the district court

upholding the final decision of the Commissioner[1] denying a

period of disability, disability-insurance benefits, and

supplemental security income.  On appeal, plaintiff argues that

---

    *  Local Rule 47.5 provides:
"The publication of opinions that have no precedential value and
merely decide particular cases on the basis of well-settled
principles of law imposes needless expense on the public and
burdens on the legal profession."
Pursuant to that Rule, the Court has determined that this opinion
should not be published.

1.  Pursuant to P.L. No. 103-296, the Social Security
Independence and Program Improvements Act of 1994, the
Commissioner of Social Security has been substituted for the
Secretary of Health and Human Services in this action.

there was not substantial evidence to support the Commissioner's decision, and that she was denied due process by the administrative law judge's failure to subpoena witnesses on her behalf. Finding no error, we affirm.

## I. FACTS

Sandra G. Waters applied for a period of disability, disability-insurance benefits, and supplemental security income. beginning on September 20, 1989, for alleged head, neck, and back injuries. Benefits were denied both initially and upon reconsideration. In her request for reconsideration, Waters mentioned, for the first time, that she suffered from depression. Waters filed a timely request for a hearing, stating that the doctors had not answered her questions about her "condition." Waters indicated in the request that she was sending additional information with the request, but the record does not reflect anything other than the request.

The Secretary issued a notice of dismissal, stating that Waters had raised, for the first time at the administrative law judge (ALJ) hearing level, an issue of mental impairment. It is unclear whether Waters appealed this notice of dismissal. Several months later, the Secretary issued another notice, stating that the decision that she was not disabled had again been reviewed and that the her lack of disability had again been confirmed. The notice also informed her of her right to appeal the decision and request a hearing before the ALJ. Waters filed

another request for a hearing in which she stated that she had medically determinable physical and mental impairments of expected indefinite duration and that she had an inability to engage in any substantial gainful employment. It does not appear that the Secretary continued to contest whether Waters could bring her issue of mental impairment.

Waters was granted a hearing, and the ALJ conducted both an initial hearing and a supplemental hearing to consider additional medical evidence submitted by Waters. At both hearings, Waters appeared without counsel. After the hearings, Waters was again denied a period of disability, disability insurance benefits, and supplemental security income. The Appeals Council denied Waters' request for review and affirmed the ALJ's decision as the final decision of the Secretary.

Waters then filed a *pro se, in forma pauperis* complaint in federal district court for review of the final decision of her claims. The Secretary answered and filed a request for judgment on the pleadings. Waters also filed a motion for summary judgment or, in the alternative, for judgment on the pleadings.

Waters complained in her motion that the Secretary's denial of her claim was not supported by substantial evidence and that the only medical expert present was a psychiatrist whose opinion was not supported by the evidence. The magistrate judge reported that the objective medical facts did not support a substantial portion of Waters' claims and that the ALJ's decision was supported by substantial evidence and recommended that the

defendants' motion be granted and Waters' motion be denied.  Over

Waters' objections, the district court adopted the magistrate

judge's report and recommendation, granted the defendants'

motion, and dismissed Waters' cause of action on the merits.

## II. DISCUSSION

### A.

Waters complains there is no substantial evidence to support

the Secretary's decision that she was not disabled.  Waters

specifically contends that she meets the criteria for Part "B"

because the evidence, mainly in the form of testimony from her

husband, demonstrated that she had severe restrictions of her

daily activities and social functions, which, along with the

other requirements in Part "A" that she met, qualified her as

having an organic mental disorder impairment under 20 C.F.R. pt.

404, subpt. P, app. 1, § 12.02.  Waters also contends that she

meets the criteria under 20 C.F.R. pt. 404, subpt. P, app. 1,

§ 1.07 for the physical condition of nerve root compression

syndrome.[2]  Waters argues that the combination of these mental

and physical conditions makes her disabled.

Waters' other complaints relating to whether there was

substantial evidence to support the ALJ's decision include:

_____

2.  The Court has found no regulation matching the one cited
by Waters for the alleged condition of nerve root compression
syndrome.  However, 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.08
(1989) describes as a neurological impairment spinal cord or
nerve root lesions, due to any cause, in combination with
disorganization of motor function.  Therefore, we assume that
Waters meant to refer to this section in her argument.

4

1) the ALJ's failure to consider her husband's testimony regarding her limited daily activities and social functions; 2) her chronic pain as disabling; and 3) the medical experts' questionable testimony and qualifications.

This court's review is limited to determining whether the record as a whole shows that the district court was correct in concluding that substantial evidence supports the findings of the Secretary and whether any errors of law were made. *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). Substantial evidence is that which is relevant and which is sufficient for a reasonable mind to accept as adequate to support a conclusion. It must be more than a mere scintilla, but it need not be a preponderance. *Id.*[3] This court may not reweigh the evidence or try the issues *de novo*, as conflicts in the evidence are for the Secretary and not for the courts to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

Waters has the burden of proving that she is disabled within the meaning of the Social Security Act. *Fraga*, 810 F.2d at 1301. The statute defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less

3. "The elements of proof to be weighed in determining whether substantial evidence exists include: 1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain; (4) claimant's educational background, age and work history." *Owens v. Heckler*, 770 F.2d 1276, 1279 (5th Cir. 1985).

5

than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating a claim of disability, the Secretary conducts a five-step sequential analysis: 1) whether the claimant is presently engaging in substantial gainful activity, 2) whether the claimant has a severe impairment, 3) whether the impairment is listed, or equivalent to an impairment listed, in Appendix 1 of the Regulations, 4) whether the impairment prevents the claimant from doing past relevant work, and 5) whether the impairment prevents the claimant from doing any other substantial gainful activity. 20 C.F.R. §§ 404.1520, 416.920; *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

In the first four steps, the burden is on the claimant. At the fifth step the burden is initially on the Secretary to show that the claimant can perform relevant work. If the Secretary makes such a demonstration, the burden shifts to the claimant to show that she cannot do the work suggested. *Muse*, 925 F.2d at 789. A finding that a claimant is disabled or not disabled at any point generally terminates the sequential evaluation. *Crouchet v. Sullivan*, 885 F.2d 202, 206 (5th Cir. 1989). However, if the claimant is complaining of mental impairment and the ALJ finds the impairment to be severe but does not meet or equal the listings, the ALJ must then do a residual functional assessment regarding the claimed mental impairment. 20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).

To meet the level of severity required for classifications as mentally impaired from an organic mental disorder under the

regulations, an applicant must meet the criteria of both Parts "A" and "B" of § 12.02. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02 (1989). Part "B" determines the severity of the disorder and states, *inter alia*, that the disorder must result in marked restriction of daily activities or social functioning. *Id*. A spinal cord or nerve root lesion, due to any cause, combined with disorganization of motor functions, as described in another section, can be a neurological physical impairment. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.08 (1989).

The ALJ determined that Waters was not disabled at the third step, as Waters' alleged physical and mental impairments did not meet or equal an impairment listed in Appendix 1 of the Regulations. However, the ALJ considered her conditions in combination to be severe. The ALJ also determined that Waters could not return to her past relevant work as a nurse, but that Waters had the residual functional capacity for light work activity, compromised only by her inability to deal with stress situations in a work setting. The ALJ then determined that Waters was capable of doing other substantial gainful activity.

EVIDENCE PRESENTED TO THE ALJ

On September 11, 1989, Waters was admitted to the Veterans' Administration (VA) hospital in Houston, Texas, where she reported that she had been in good health until May 27, 1989, when she fell, hitting the back of her head, neck and back. Waters reported that two weeks after the incident, she developed muscle pain and stiffness in the neck, for which she was placed

7

on Motrin and Bactrim by the VA hospital and seen as an outpatient. Waters reported that the night prior to her admission to the VA hospital, she increased the dosage of her medicine, drank a beer, and went to bed. She then reported that she experienced a possible seizure or fainting spell. An electroencephalogram (EEG) revealed cyclomotor variant, which could be seen in normal people. A computed tomography (CT) scan revealed the question of a lesion in the left temporal subcortical area. The radiologist reviewed the CT scan but felt that without a mass effect, the lesion was probably not an abnormality or tumor and was probably a negative study. A CT with contrast was recommended, but Waters left the hospital without having the procedure performed. Waters was discontinued off Bactrim and placed on 750 mg of Robaxin and continued on Tylenol.

In October 1989, Waters was admitted to the VA hospital for a myelogram because of complaints of constant cervical pain beneath the skull radiating to both arms. The physical examination revealed a "well-developed, well-nourished woman in no distress." Waters' neck was supple without thyromegaly[4] or bruits[5]. Her cranial nerves II through XII were intact. However, a sensory exam revealed decreased sensation to pain and light touch in the lateral right side of the arm up to the elbow

---

4. Thyromegaly is the enlargement of the thyroid gland. STEDMAN'S MEDICAL DICTIONARY 1600 (25th ed. 1990).

5. A bruit is a harsh or musical, intermittent auscultatory sound, especially an abnormal one. Id. at 215.

8

and the lateral right leg up to the knee. Her chest x-ray and EKG were unremarkable. A CT scan of the lumbar region was normal except for some osteoporosis. An electromyography (EMG), which could be performed only on the right side because Waters stopped the test with complaints of nausea and pain, was normal. A magnetic resonance imaging (MRI) showed a normal brain with no sign of abnormalities in the basal ganglia where such abnormalities had been seen on the CT. The abnormalities were considered probable calcifications of the idiopathic[6] type and were insignificant. A lumbar and cervical myelogram showed that there was no evidence of nerve root sleeve deformities or extradural defects, although there was less filling in one portion of the lumbar region on the right side. When Waters was informed that her MRI results were normal, she stated she would ask for a second opinion and that she did not want any medication. Waters was discharged on no medication with a follow-up appointment in the neurology clinic.

In December 1990, Waters underwent a psychiatric examination performed by Dr. Mohsen Mirabi, at the request of the Texas Rehabilitation Commission. Waters informed Dr. Mirabi that in May 1989, she sustained a severe head injury after an altercation with a Harris County Sheriff Deputy and thereafter developed numbness in her upper extremities for which she had seen a chiropractor and a neurologist. Waters also informed Dr. Mirabi

---

6. Idiopathic denotes a disease of unknown cause. Id. at 762.

9

that she was treated at the VA hospital where doctors discovered a lesion at the bottom of her brain. She reported that at the present time she was taking Tylenol, Robaxin, Indocin, Maalox, and Elavil up to 250 mg per day. She further stated that she was extremely distressed, upset, and frustrated as she had not been able to work. She reported that she had gained over 40 pounds in the past year and that this problem, in itself, appeared to be stressful for her. Dr. Mirabi reported that Waters appeared to have developed the signs and symptoms of depression and that she felt very bitter towards the medical profession and the legal system.

Dr. Mirabi also reported that Waters informed him that she made every effort to do household chores, such as cooking, washing, and cleaning. Waters informed Dr. Mirabi that her social interactions were limited and that she had become seclusive and her ability to undertake any specific tasks had diminished. She also reported becoming hopeless and feeling helpless. Dr. Mirabi reported that Waters was very cooperative throughout the interview and that she was appropriately dressed and neatly groomed. Her psychomotor activities were drastically decreased and withdrawn. Waters' mood was anxious, depressed, and tearful. Waters denied hallucination, and there was no evidence of delusion. Dr. Mirabi also reported that her orientation, sensory, memory, and ability to abstract appeared to be intact and that there was no evidence of impaired judgment or insight. Dr. Mirabi reported that Waters in general had become

10

extremely irritable and frustrated. After ruling out major depressive disorder and posttrauma with depression, Dr. Mirabi determined that Waters was suffering from an organic affective disorder. Dr. Mirabi concluded that Waters' prognosis was fair and that her ability to understand how to file for benefits and to manage funds was not impaired.

In December 1990, Waters also saw Dr. Raymond Martin, a neurologist. Waters informed Dr. Martin that the police attacked her in her home when they were looking for her boyfriend. She related that as a result of this attack she has experienced chronic low back pain and intermittent paresthesia[7] in her hands and toes and had progressive difficulty emptying her bladder. She also reported that in August 1989, she had an episode of lost consciousness, preceded by a strange feeling. She reported that when she awoke she felt generalized twitching, but that the doctors at the VA hospital did not think her episode was a seizure.

Dr. Martin found Waters' neurological exam to be essentially normal except for a subjective stocking-and-glove sensory loss that appeared to be more in the hands than in the feet. He also reported that Waters had limitation of cervical motion in all directions. Dr. Martin reported that Waters had an unusual history and that he was not sure how the findings of his scans related to her injury. He advised her not to drive and to avoid

---

7. Paresthesia is an abnormal sensation, such as burning, pricking, tickling, or tingling. STEDMAN'S MEDICAL DICTIONARY 1140 (25th ed. 1990).

activities where a loss of consciousness could be a risk.  An EEG performed in February 1991 and a MRI examination of the cervical spine performed in March 1991 were within normal limits.

In September 1991, Waters underwent a psychological evaluation by Stephen Williams, a clinical psychologist and neuropsychologist.  Waters reported that she received a head injury after she was tackled by a police officer during a police call.  She reported that the incident resulted in chronic pain which prevented her from doing much lifting and that she had also developed high eyeball fluid pressure, similar to glaucoma, for which she was taking medication.  On the Wechsler Adult Intelligence Scale - Revised, Waters had a full-scale intelligence quotient (IQ) of 102, which placed her in the average range of intellectual functioning.  Williams reported that Waters' subtest scores suggested that at one time before her accident she probably had a considerably higher IQ level, but that the scores requiring more immediate memory skills appeared to have been significantly disrupted due to the accident. Williams also reported that an organic problem could have caused the discrepancy between Waters verbal-scale score of 110 and her performance-scale score of 95.  Williams reported that Waters did poorly on the Benton Visual Retention Test and that her performance suggested that an organic nervous system injury was present.

Williams reported that Waters was good humored but appeared to be inwardly depressed about her physical and relational

changes due to weight gain and inactivity. Williams noted no major depression, suicidal tendencies, severe elation, psychotic-like preoccupations, or abnormalities of mental content. Her memory and concentration were adequate although they lagged behind her other mental traits. Williams considered her intellectual ability to be above average and her judgment to be excellent. Williams also considered her psychomotor behavior and speech to be normal, but that her gait was a bit slow. Williams noted that Waters was on 50 mg of Amitriptyline twice a day and 100 mg at night, Robaxin for muscle spasms, Tylenol for pain, and Sinimet for arthritis.

Williams opined that Waters was capable of managing a habitation, preparing meals, grooming, and dressing appropriately. However, he also considered that because Waters had difficulty with memory of information, lifting and turning over people, and bending to make beds, that she would have trouble returning to her work as a licensed vocational nurse. Williams concluded that Waters suffered from an organic affective disorder akin to dysthymia.[8] He also concluded that Waters appeared to have some memory problems, but that she would be able to engage in low-stress occupations where she did not have large amounts of physical or emotional demands.

HEARINGS BEFORE THE ALJ

---

8. Dysthymia is any disorder in mood. STEDMAN'S MEDICAL DICTIONARY 480 (25th ed. 1990).

At her initial hearing on February 26, 1992, Waters appeared and waived her right to representation. Waters testified that she was 38 years old and was working on her bachelor's degree in nursing at the time of her injury. She stated that she could barely lift her two-year-old granddaughter and that she could not sit more than 15 minutes at a time without having to stand. She testified that she was married and had three girls, but that none of the girls were currently living with her. Waters also testified that Dr. Martin had told her she could not drive because of her "blank-outs," which Waters stated had something to do with a psychomotor disturbance. The ALJ introduced vocational expert Wayne Ray Alfred and Dr. King, an internist, both of whom were expected to testify at the hearing.

Alfred testified that his assessment of Waters' vocational profile was that Waters had been primarily employed in health care services occupations and that this fact was the only thing he could tell from the record. Alfred also testified that Waters had not acquired any transferable skills. The ALJ asked Alfred to assume that Waters was capable of performing light exertional work, but that, nonexertionally, her psychiatric impairments in the form of a depression and memory problems could lead to an inability to deal with work stresses effectively, which would limit her to engaging in low-stress occupations that did not have large amounts of physical or emotional demands. The ALJ also asked Alfred to assume that Waters would not be able effectively to understand, remember, or carry out complex job instructions.

14

The ALJ then asked Alfred what jobs were available to a person with these limitations.

Alfred opined that such job would be a repetitive job that would require little or no latitude for judgment and would involve low stress. Such jobs would be assembly-type jobs, such as a nuts-and-bolts assembler, small-products assembler, eye-glass assembler, eyeglass frame polisher. Alfred stated that, in his opinion, well over 100,000 such jobs existed in the national economy. The ALJ gave Waters the opportunity to cross-examine Alfred as to his findings and opinions, but she declined.

Waters informed the ALJ that she had seen other doctors including Dr. Martin, which were not reflected in the medical records before the ALJ, and that she had submitted these additional records to the Social Security Office. The ALJ stated that he did not have the record, that he needed them, and stated that he did not want to go any further until Waters had obtained the records. The ALJ informed Waters that when he received the records, he would convene another hearing.

On April 9, 1992, the ALJ convened a supplemental hearing and stated that after reviewing the new evidence he deemed it necessary to take additional evidence in the form of the testimony of Dr. Milton Altschuler, a psychiatrist, and vocational expert Ted Jolly, who were not present at the original hearing. Waters appeared at the hearing and again waived her right to representation. Waters stated that she did not have the

15

opportunity to ask the previous medical expert any questions, but was reminded that the medical expert did not testify.

Dr. Altschuler testified that he received his medical degree at the University of Texas Medical Branch in Galveston, Texas, in 1959, performed three years of psychiatric residency, later became certified by the American Board of Psychiatry/Neurology, and eventually was made a fellow of that same board. He also stated that currently, he was a member of several national, state, and city psychiatric associations and that he was a clinical professor of psychiatry at Baylor College of Medicine. He also stated that he was being paid by the Government for his appearance and testimony in the Social Security Administration's Disability Program, but that despite that fact, he was at the hearing as an independent professional witness to give testimony in the area of his expertise and not as a witness for the Government to testify against Waters and her claim.

Altschuler testified that he had looked at all of the records of the case and had never previously spoken to the ALJ about the case. Altschuler testified that the records indicated that Waters was a 39-year-old woman with a history of hitting the floor during an altercation on May 27, 1989, who later complained of cervical pain with radiation to both arms. Altschuler noted that there was no evidence of a seizure disorder and that the episode of syncope followed the taking of medication and alcohol. Altschuler also testified that the records indicated a mild organic affective disorder, although there was no other evidence

16

to indicate that there was an organic brain disorder.  He further testified that Waters met criteria A of 12.02, organic mental disorder, but that she did not meet criteria B of that section. Altschuler stated that he believed Waters had few limitations, either physical or psychological, that would affect Waters' ability to function in a day-to-day, 8-hour day, 40-hour-a-week regimen.  Dr. Altschuler also testified that there was no evidence of anything more than a mild restriction of daily activities, social functioning, and concentration.  Altschuler noted that Waters could have some sedation from the Amitriptyline she was taking, but that such an effect was usually dependent upon the dosage and was very idiosyncratic.

Upon cross-examination by Waters, Altschuler stated that he had studied the medical records and noted that while the records had noted a questionable lesion at the base of the brain, the records also noted that the lesion was not significant. Altschuler stated that he could not give an interpretation or an independent evaluation of the CT scan, that it was not his specialty, and that he could only review the medial records.  He also stated that he did not know if a physical lesion in the brain would have any bearing on any physical or mental symptoms. Altschuler testified that his testimony was that Waters met the initial criteria of organic brain syndrome, dealing primarily with a disturbance in mood and that she exhibited a relatively chronic depressive mood.  However, Altschuler also testified that the records did not indicate any restriction of daily living, any

17

articular difficulty in maintaining social functioning, any deficiency of concentration, persistence, or pace, and that there was never an episode of deterioration or decompensation in a work-like setting that was secondary to Waters' organic mood disorder. Altschuler admitted that the records did not show an abundant social life, but that there was no evidence of a severe social disability. Altschuler also stated that he had taken into consideration the fact that Waters had been chronically depressed since November 1989.

Altschuler testified that he noticed only one episode of syncope, and that in his opinion there was nothing from a psychiatric perspective that would prevent Waters from returning to the nursing profession. However, Altschuler added the caveat that he doubted Waters could work around a lot of nursing peers and demanding patients, such as infants, due to her mood disorder.

Waters attempted to ask Altschuler about any tests that the records indicated were ordered but were not performed. At this point, the ALJ informed Waters that Altschuler was at the hearing solely to give opinion evidence with respect to the evidence that was in the record and not to speculate on anything that Waters' treating physician did or did not do. Waters then testified and complained to the ALJ that she did not believe the medical records adequately reflected her mental and physical condition and testified that a number of tests she requested to be done when she was in the VA hospital were not performed.

18

Vocational expert Jim Jolly testified that he also participated in the Social Security Administration's Disability Program, but that he understood that he was present to give his independent, professional opinion and not to testify against Waters or her claim. Before testifying to the ALJ's questions, Jolly ascertained from Waters that she went to school to the eleventh grade, obtained her GED, and graduated from a vo-technical school with a nursing degree. He also determined that Waters was licensed in Texas and had been a nurse for 14 years. Jolly then testified that Waters had worked as a pediatrics nurse, an emergency room nurse, and a cardiac nurse, which were all skilled jobs. Jolly testified that Waters had transferable skills from these jobs, such as knowledge of medical nomenclature, clerical skills, computational skills, and an ability to communicate with the public.

The ALJ asked Jolly to consider what jobs would be available in significant numbers to an individual with Waters' age, educational background, and training. The ALJ also asked Jolly to consider that the individual had a nonexertional impairment in the form of an organic affective syndrome that required the person to work in as stressless an environment as possible. Jolly testified that the stress element eliminated Waters' previous work, but that such an individual could perform the duties or a light sitter or companion if she could work with people she did not have to handle. Jolly also testified that the individual could perform the duties of mail clerk, leasing clerk,

19

light cashiering, and a variety of unskilled, light jobs, such as customer service clerk or sales clerk.  Jolly also testified that inspection jobs and working on an assembly line would be appropriate jobs.  Jolly testified that these jobs did not involve complex instructions and that the jobs existed in excess of 10,000 to over 100,000 position per job in the national economy and in excess of 1,000 to 5,000 per job in the local economy.

Upon cross-examination, Jolly testified that Waters had demonstrated her scholastic abilities by obtaining a nursing degree, that she read and could spell beyond the twelfth-grade level and computed mathematical problem at the eighth-grade level and that these factors combined with her past work experience demonstrated very good skills.  Jolly also testified that the jobs he mentioned were far below Waters' prior functioning level. Jolly testified that there was no hazardous machinery in any of these jobs and noted that none of these jobs involved driving a vehicle, except for the leasing-clerk positions that involved automobiles.

Upon examination by the ALJ, Waters testified that her medication made her sleepy and that as a result she did not follow a normal schedule, which meant going to sleep in the mornings, being up for a few hours, and then going to sleep in the afternoon after taking her second dose.  Waters also testified that she was supposed to take her medication every day but that she did not do so on the day of the hearing so she could

be present.  She also testified that her husband drove her to the hearing.

When asked by the ALJ if she had anything else to offer, Waters reiterated that there were omissions in her medical records, which included things that should have been explored, such as a hormone work-up and analysis of her pituitary gland and optic nerve.  Waters also stated that she had tried to go back to nursing, which was the only thing for which she was trained, but that no one would hire her.  She specifically stated that if an owner of a convenience store asked her to clerk and allowed her to make her own schedule, she would not work as a cashier because she would be afraid that her imperfect memory would cause her to miscount the money.  She also stated that such a job required her to be friendly to customers and that she did not feel friendly every day and could not put in 8 hours a day any more.

Michael Hudson, Waters' husband, testified at Waters' request.  Hudson testified that Waters did not sleep very well and usually got up a lot during the night.  He also testified that he did most of the driving because on occasion when Waters would drive to pick up Hudson from work she would forget where she was going and go home.  He testified that Waters became uncomfortable sitting in the passenger seat after only a few miles.  Hudson also testified that Waters' medication occasionally made her act like she was on "speed" and made her forget things.  He testified that they would periodically visit his mother or a few of his friends would come to the house, but

21

that they rarely went would because Waters did not have a long attention span, would get irritable, and that sometimes she would get mad for no apparent reason.

FINDINGS BY ALJ

The ALJ ultimately concluded that the medical evidence demonstrated Waters' impairments as cervical pain and organic affective disorder, that these conditions in combination were severe, and that the severity precluded Waters from returning to her past relevant work. However, the ALJ also concluded that there were other jobs existing in significant numbers in the national economy that Waters could perform, and that therefore, she was not disabled.

The ALJ specifically noted that the evidence demonstrated that Waters did not meet or equal all of the requirements of § 12.02. The ALJ also stated that after considering Waters' testimony, the objective clinical findings, and the testimony of the medical expert, the ALJ determined that Waters' testimony as to limitations was not credible and that Waters did not have any limitations capable of producing the pain and functional limitations of which Waters complained. The ALJ noted that Waters was capable of performing routine household chores and could lift her two-year-old granddaughter, which indicated an ability to lift at least up to 20 pounds. The ALJ also noted that Waters' pain medication of Motrin and Tylenol was consistent with no more than a mild-to-moderate degree of pain. The ALJ found that Waters had the exertional residual functional capacity

22

for at least light work activity. The ALJ also found from the evidence that her capacity for light work activity was compromised only by her inability to deal with stress situations in a work setting. The ALJ determined that Waters was not disabled and could perform such jobs as sitter/companion, mail clerk, ward clerk, cashier, customer service clerk, and sales clerk.

SUBSTANTIAL EVIDENCE TO SUPPORT ALJ'S DECISION

Repeated CT scans, EEGs, and other tests demonstrated minor problems with Waters' physical condition. Results from neurological examinations were mainly normal. Further testing demonstrated that the suspicious brain lesion found during testing at the VA hospital was either non-existent or inconsequential. A lumbar and cervical myelogram showed no evidence of nerve root sleeve deformities or extradural defects. Psychological testing demonstrated that an organic mental disorder could be present, but that it did not impair Waters' judgment, orientation, sensory functions, or her ability to abstract. At most, Waters' memory was affected in a limited capacity. Medical expert Altschuler did not find that Waters' daily activities or social functions were so limited that she met Part B of the criteria for having a severe organic mental disorder. Altschuler stated that Waters records indicated only one episode of syncope and that the records demonstrated few limitations that would affect her ability to work an eight-hour day and 40-hour week. Considering all of the above evidence, the

23

ALJ's decision that Waters was not disabled was supported by substantial evidence.

COMPLAINT THAT THE ALJ DID NOT CONSIDER HUDSON'S TESTIMONY

Waters insists that Hudson's testimony clearly demonstrated her restricted daily activities and social functioning. As stated earlier, Altschuler testified that the records indicated a mild organic affective disorder, that Waters met criteria A of 12.02, organic mental disorder, but that she did not meet criteria B of that section.

The ALJ has the sole responsibility to determine the claimant's medical status, and, therefore, he "`is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly.'" *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). It is clear from the evidence presented above that the ALJ considered Altschuler's testimony to be more credible than that of Hudson in considering the limitations of Waters' daily activities and social functioning. The ALJ was within its authority to make this determination.

COMPLAINTS REGARDING THE MEDICAL EXPERTS

Waters also contends that the medical experts upon which the ALJ relied never examined Waters. Waters also states that the medical expert, Milton Altschuler, was not a medical doctor, was not board certified in neurology, as represented by the ALJ, and,

24

therefore, was not qualified to interpret Waters' residual physical capacity for gainful employment.

The majority of Waters' complaints in this area are without merit. In the first hearing, the medical expert was not used as the ALJ stopped the hearing to allow Waters to complete the medical records before the ALJ. Additionally, Altschuler's testimony and professional qualifications submitted to the ALJ demonstrated that he was a medical doctor, that his specialty was psychiatry, and that he was board-certified in psychiatry and neurology. Also, the ALJ specifically informed Waters that Altschuler was at the hearing only to testify as to the evidence in Waters' medical records and not independently to assess her physical capabilities. The fact that Altschuler did not examine Waters is immaterial. Consequently, Waters' complaints that she was not examined by a testifying medical examiner and that Altschuler lacked the necessary qualifications to assess her residual physical capacity for gainful employment are meritless.

SUBJECTIVE COMPLAINTS OF PAIN

Waters also contends that her chronic pain is a disabling condition and that objective medical evidence supported her subjective complaints of pain. As stated earlier, the ALJ did not fully credit Waters' reports of pain, noting that the Motrin and Tylenol which Waters was taking did not signify disabling pain.

Pain is a disabling condition under the Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic

25

treatment." *Selders*, 914 F.2d at 618-19 (citations and internal quotations omitted).  Subjective complaints of pain must be corroborated by "objective medical evidence" which "demonstrate[] the existence of a condition that could reasonably be expected to produce the level of pain or other symptoms alleged.  *Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992).

The above objective medical evidence supports the ALJ's statement that Waters was taking Motrin and Tylenol for pain, although the medication indicates that Waters' pain, though possibly real, is not constant, unremitting, and unresponsive to treatment.  Additionally, no medical report indicated a finding that Waters was in constant, unremitting pain.  Therefore, the ALJ's determination is supported by substantial evidence.

B.

Finally, Waters states that the hearing was constitutionally deficient as an appellate process as she demanded that witnesses be summoned on her behalf but was denied the presence of these witnesses.  When it is necessary for a full presentation of a case, an ALJ may, either on his own initiative, or at the request of a party, issue subpoenas for the appearance and testimony of witnesses.  20 C.F.R. § 404.950(d)(1)(1989).  Parties who wish to subpoena witnesses must file a written request with the ALJ at least five days before the hearing date.  The written request must give the names and addresses of the witnesses, and state the important facts that the witnesses are expected to prove.  *Id*. at § 404.950(d)(2).

26

In her request for a hearing, Waters wrote that she wanted witnesses to be subpoenaed on her behalf, although she also checked the box indicating that she had no additional evidence to submit. She did not indicate who those witnesses were, where they were located, or about what they would testify, but instead she referred to an earlier letter she sent which allegedly contained a list of her prospective witnesses. The letter is not in the record.

Other than the reference to this letter, nothing in the record or on appeal suggests that Waters complied with the requirements of § 404.950(d)(2). The transcript of her first hearing indicates that Waters did not mention her request to subpoena witnesses, although she did inform the ALJ of her desire to add additional documents to her medical evidence. At the second hearing, Waters again did not mention her request to subpoena witnesses when the ALJ asked her if she wanted to present any further evidence before the hearing terminated. Additionally, Waters has not given any indication, either in the district court or on appeal, of the identity of the witnesses she wanted to attend the hearing, their location, or the substance of their expected testimony. Waters has failed to demonstrate that she was denied due process in her hearing.


III. CONCLUSION

For the reasons discussed above, the judgment of the district court is AFFIRMED.

27